### JEANGUENAT, Ex'x, v. OKLAHOMA POWER & WATER CO. et al.

No. 20884.   Opinion Filed June 2, 1931.

Rehearing Denied July 28, 1931.

Joy G. Clayton, Davidson & Williams, and Bert E. Johnson, for plaintiff in error.

Charles B. Stuart, Charles A. Coakley, and E. J. Doerner, for defendants in error.

KORNEGAY, J. The statement of facts as set forth in the brief of the plaintiff in error, beginning on page one, appears to be correct, and is as follows:

#### "Statement.

"The parties will be considered in this brief as they appeared in the trial court.

"This action was instituted in the district court of Tulsa county, Okla., on the 23rd day of October, 1928, by Mary Belle Jeanguenat, as executrix of the estate of Eugene Jeanguenat, deceased, against the Oklahoma Power & Water Company and the Sand Springs Gas Company, to recover damages for injury received by her husband, Eugene Jeanguenat, which resulted in his death. Plaintiff sued upon two separate causes of action: First, for the personal injury suffered by the said Eugene Jeanguenat in his lifetime, and for the benefit of the estate of the deceased; and, second, for the injury sustained by this plaintiff and next kin by reason of the death of the said Eugene Jeanguenat as a result of the negligence of the defendants.

"The case came on regularly for trial on April 29, 1929, before Honorable Luther James, judge of said court, and before a jury. Evidence was introduced on behalf of the plaintiff on April 29, 1929, and April 30, 1929. Plaintiff rested. The defendants and each of them demurred to plaintiff's evidence. The demurrer was argued and was sustained. The plaintiff excepted to the ruling of the court.

"On May 1, 1929, plaintiff filed a motion for a new trial, which came on for hearing on June 15, 1929, was overruled, exceptions allowed, plaintiff gave notice of appeal in open court and was allowed 60-10-5 days to make and serve case-made. The case-made was made and served and appeal was taken in regular order."

Briefs on behalf of both parties have been filed. We have examined these briefs, and the evidence that was introduced at the trial by the plaintiff in error. Complaint is made of the refusal by the court to allow the plaintiff, who was the wife of the deceased, to testify concerning what was told her by the deceased as to how he was burned. This evidence was excluded by the lower court. Section 589 of the Statutes, in the 3rd subdivision, says:

"589. Incompetents Classified. The following persons shall be incompetent to testify:

"Third: Husband and wife, for or against each other, except concerning transactions in which one acted as the agent of the other, or when they are joint parties and have a joint interest in the action; but in no case shall either be permitted to testify concerning any communication made by one to the other during the marriage, whether called while that relation subsisted, or afterwards."

The lower court excluded this, as well as an offer to establish practically the same thing by other witnesses. Neither appears to have been of such a nature that it could have reasonably been classified under the

name "res gestae," and we are of the opinion that the lower court did not err in excluding the offers of evidence that were proffered.

It appears that the deceased was asleep when his clothing caught fire, if the proffered evidence was really true. If he, a man 92 years old, was asleep, his declaration as to what did happen while he was asleep would scarcely be of any probative force, and we think the court did not err in excluding the declaration of the deceased concerning matters that happened while he was asleep.

The ground of liability relied on in the petition was that the flame shot out suddenly from a stove and caught clothing of the deceased, resulting in his being burned, and death. The stove that was used, according to the testimony of the plaintiff as found in her later examination on page 100 of the case-made, was evidently a closed type of stove that had isinglass in the front, and there were some two or three small squares that had come out. There is no testimony to show what the condition of the pressure was immediately before or immediately after the accident, and none as to what it was when the accident occurred. There was some testimony that at times when the gas was first lit, it would flame out of the stove. It appears, however, that it was a stove in which there were bricks and the gas jets were in the bottom. That happens frequently in that class of stove, or in any other form of gas stove that enables the gas to gather in quantity. This quantity, of course, varies with the activities of the one lighting the gas after turning it on. Evidently that was what was in the mind of the witness who testified about the blowing out on opening or shutting off the gas.

The lower court in this case saw the witnesses and was able to judge of their demeanor before the jury, and the lower court was probably more familiar with the way gas stoves act than most of the men on this court, as the lower court is in one of the oldest gas fields in the state.

The lower court could not find any negligence that occurred that was the proximate cause of the injury to the deceased. The circumstances that were detailed in the evidence by the plaintiff herself fall short of making a case of negligence on the part of the defendants below that could reasonably be held the proximate cause of the accident. In detailing, at page 31 of the case-made, the plaintiff testifies as follows:

"Q. What was that trouble? A. The high pressure gas came up at times—sometimes it would be low and sometimes it went out of the stove. Q. Tell how the flame went out? A. It would shoot out, not only the heating stove but the cook stove. Q. Would there be any warning when the flames would shoot out? A. No, sir, didn't know when it was going to happen. Q. How often did it happen? A. Quite a good many times. Q. Tell the jury how many times you saw it shoot out before the accident the last two or three weeks? A. Well, every day when we would turn the gas on and off at times it had been shooting out. Q. How is that? A. I believe it was the 13th they turned the gas off on it. Q. Why did they turn it off? A. I didn't get my check."

All persons familiar with gas on a cold day in the winter time know that the pressure will vary at different hours of the day and recognize that they must watch their own stoves, and gauge them by the general pressure that is on, and most of us have experienced the flashing out of burning gas when first turned on, coming from the accumulation before the flame starts.

As the trial court was evidently familiar with the situation and the evidence, and sustained a demurrer to it, and it not appearing from the evidence itself that it has committed an error, we think its action should not be disturbed, and the case is accordingly affirmed.

CLARK, V. C. J., and RILEY, HEFNER, CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur. LESTER, C. J., absent.